UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| YUNGHUI CHEN, on behalf of herself and all others similarly situated,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>WESTERN DIGITAL CORPORATION AND WESTERN DIGITAL TECHNOLOGIES, INC.,<br><br>　　　　Defendants. | CASE NO. 8:19-cv-00909-JLS-DFM<br><br><br>**ORDER (1) CONDITIONALLY GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT (Doc. 6); AND (2) SETTING A FINAL FAIRNESS HEARING** |

Before the Court is Plaintiff Yunghui Chen's unopposed Motion for Preliminary Approval of Class Action Settlement.  (Mot., Doc. 6; Mem., Doc. 19.)  Chen asks the Court to (1) certify the proposed class and collective action for settlement purposes only; (2) preliminarily approve the terms of the class action settlement; (3) appoint David Sanford and Felicia Medina as Class Counsel and Chen as Class Representative; (4) approve the form and content and authorize mailing of the proposed class notice; and (5) schedule a final fairness hearing.  (Mem. at 2.)  The Court held a hearing on the Motion on December 6, 2019 and took the matter under submission.  For the reasons set forth below, the Court now CONDITIONALLY GRANTS the Motion, setting a Final Fairness Hearing for **November 20, 2020, at 10:30 a.m.**  The parties should carefully review and comply with the conditions of this Order.

# I.    <u>BACKGROUND</u>

Defendant Western Digital Corporation, Inc. is "engaged in data storage and hardware manufacturing."  (Answer, Doc. 29 ¶ 1.)  Defendant Western Digital Technologies, Inc. ("Western Digital Technologies") is a wholly owned subsidiary of Western Digital Corporation.  (Compl., Doc. 1 ¶ 5.)  Where appropriate, the Court collectively refers to Defendants as "Western Digital."  Chen joined Western Digital Technologies as a Senior Internal Auditor in 2005.  (*Id.* ¶ 3.)  She was promoted to Internal Audit Manager in 2008 and remained in that position until her employment ended in September 2016.  (*See id.* ¶ 4.)  Chen alleges in her Complaint, and Western Digital denies, that Western Digital "subjected female employees to a pattern and practice of systemic unlawful disparate treatment and unlawful disparate impact discrimination," which discrimination Chen alleges to have personally experienced.  (*See id.* ¶¶ 30–32, 34.)

On November 14, 2016, Chen filed a Private Attorneys General Act ("PAGA") Notice with the California Labor & Workforce Development Agency ("LWDA"), asserting claims under PAGA arising from the alleged unlawful conduct by Western

1  Digital.  (Fuschetti Decl. ISO Mot., Doc. 6-3 ¶ 9.)  Beginning around then, the parties

2  entered into "arm's length negotiations over a tolling agreement, pre-suit discovery, and

3  the terms of a potential class action settlement."  (Compl. ¶ 10.)  On April 27, 2017,

4  following a full-day mediation, the parties reached a tentative agreement to settle the case

5  and executed a memorandum of understanding to capture key terms to which they had

6  agreed.  (*See* Fuschetti Decl. ISO Mot. ¶ 14.)  The parties executed the final agreement—

7  the Collective and Class Action Settlement Agreement ("Settlement Agreement")—on

8  May 14, 2019.  (*See id.* ¶ 15.)  Chen filed her Complaint the same day.  The Complaint

9  contains the following counts, which Chen brings in her individual and representative

10  capacities:  (1) gender discrimination under Title VII of the Civil Rights Act of 1964; (2)

11  pay discrimination under the Fair Labor Standards Act, *as amended* by the Equal Pay Act;

12  (3) gender discrimination under the California Fair Employment and Housing Act; (4) pay

13  discrimination under the California Equal Pay Act, *as amended* by the California Fair Pay

14  Act; (5) unfair competition under California's Unfair Competition Law; and (6) claims

15  under PAGA.  (Compl. ¶¶ 72–127.)

16      The Settlement Agreement sets forth two mutually exclusive subclasses, the

17  California Sub-Class and the Nationwide Sub-Class, and a group of "Collective Action

18  Plaintiffs" that overlaps with both sub-classes (collectively, the "Class" or "Class

19  Members").  (*See* Settlement Agreement §§ 1.3, 1.6, 1.17.)  The California Sub-Class

20  comprises "women directly employed by Western Digital Technologies, Inc., Western

21  Digital (Fremont), LLC, and/or Western Digital Media, LLC[1] in California in a Covered

22  Position at any time from November 1, 2012 through the date of [this Order.]"  (*Id.* § 1.3.)

23  A Covered Position is defined as "an indirect labor position at the Senior Manager level or

24  below."  (*Id.* § 1.8.)  The Nationwide Sub-Class comprises "women directly employed by

25  Western Digital Technologies, Inc., Western Digital (Fremont), LLC, and/or Western

---

[1] Western Digital Technologies, Inc., Western Digital (Fremont), LLC, and Western Digital Media, LLC are wholly owned U.S. subsidiaries of Western Digital Corporation.  (Compl. ¶ 1.)

3

Digital Media, LLC in a Covered Position as regular employees in the United States at any time from November 1, 2013 through the date of [this Order.]" (*Id.* § 1.17.)  The Nationwide Sub-Class excludes members of the California Sub-Class.  (*Id.*)  Chen estimates that the Class numbers approximately 1,370 individuals.  (*See* Mem. at 4.)

The terms of the Settlement Agreement provide that Western Digital shall pay a gross settlement amount of $7,750,000 into the Settlement Fund.  (*See* Settlement Agreement §§ 1.26, 4.1.)  The Settlement Fund is non-reversionary, meaning that no amount of it will revert to Western Digital after distribution.  (*See* Mem. at 7; *cf.* Settlement Agreement § 1.26.)  The Settlement Agreement further provides for (1) an award of attorneys' fees not to exceed $2,583,333 (33 ⅓% of the Settlement Fund); (2) reimbursement of Chen's litigation costs not to exceed $180,000; and (3) a service award to Chen in the amount of $50,000.  (Settlement Agreement §§ 4.2.3–4.2.5.)  Additionally, $50,000 of the Settlement Fund is reserved for payment of the Class Administrator's fees and costs, and $75,000 of the Fund is earmarked for the LWDA payment required in PAGA settlements.  (*See id.* §§ 4.2.1–4.2.2.)

After these distributions, the remaining "Settlement Awards Fund" (the "Settlement Fund")—an estimated $4,811,667—will be distributed to Class Members.  (*Id.* § 4.2.6.)  Each Class Member's award will be calculated based on a formula that accounts for the Member's "individual rate of pay and length of employment within the applicable Class Period, as well as whether she has previously signed a release of claims."[2]  (Mem. at 7; *see also* Settlement Agreement § 4.3.)  On average, each Class Member will receive $3,615. (*See* Mem. at 7.)

The Settlement Agreement requires that Class Members receive their shares of the Settlement Fund automatically by check within thirty days of the Court granting final approval of the settlement, provided the Class Member does not opt out; no claim form or

---

[2] At the hearing on this Motion, Class Counsel clarified that some Class Members might have signed general releases in return for severance packages.

other submission is required to receive payment.  (*See* Mem. at 23; Settlement Agreement § 7.1.)  Class Members will have 180 days to cash their checks.  If a Class Member does not timely cash a check, the parties wish the corresponding funds to be evenly distributed between two nonprofit organizations[3]:  Legal Aid at Work and the Legal Aid Society of Orange County.  (*See* Settlement Agreement § 7.5.)  The parties identified Legal Aid at Work as a recipient because it "provides legal advice, representation, and legislative support, particularly with respect to issues of employment law, to low-income, working families in California" and because the organization targets gender discrimination through various initiatives.  (*See* Mem. at 7.)  The parties selected The Legal Aid Society of Orange County because it provides "civil legal services to seniors and low-income individuals and [ . . . ] promote[s] equal access to the justice system" (*see id.* at 8 (alterations in original) (internal quotation marks omitted)).[4]

Finally, the settlement includes programmatic relief provisions, under which Western Digital will undertake "sweeping programmatic measures to help eliminate gender disparities and foster equal employment opportunity going forward" (*see id.* at 8; Settlement Agreement § 3):

> [Western Digital] will undertake initiatives to (1) evaluate, promote, and compensate women equitably; (2) perform statistical analyses with regard to evaluation, promotion, and compensation; (3) design and execute leadership development initiatives for women; (4) bolster their policies regarding flexible work arrangements and maternity and parental leave; (5) maintain records relevant to this agreement; (6) reinforce their commitment to EEO [(equal employment opportunity)] compliance and enforcement; and (7) enhance their processes for investigation of internal complaints, such as complaints of gender discrimination.

(Mem. at 8 (citing Settlement Agreement §§ 3.4–3.10).)

---

[3] The parties also designated unused settlement administration funds that remain in the Fund once administration has concluded to go to the two organizations.  (*See* Settlement Agreement § 7.5.)

[4] The Court notes that Legal Aid Society of Orange County appears to have changed its name. In addition, the Court needs more information as to how the mission of the entity relates to the goals of this litigation.  The Court addresses this further in Section IV.I., *infra*.

Chen filed the instant Motion on May 14, 2019.  On August 8, 2019, the Court issued an Order requesting supplemental briefing on deficiencies it identified in Chen's briefing.  (*See* First Req. for Suppl. Briefing, Doc. 27.)  Those deficiencies were that (1) Chen did not identify Western Digital's maximum potential liability, as required at the preliminary approval stage; and (2) she revealed in a perfunctory footnote that the parties also reached a confidential side agreement to resolve Plaintiff's individual claims, without demonstrating that the agreement did not present collusion or adequate-representation concerns.  (*See id.* at 1–2.)  Chen timely complied, but the Court requested additional briefing on both points.  (First Suppl. Br., Doc. 38; Second Req. for Suppl. Briefing, Doc. 41.)  Chen timely filed a second supplemental brief.  (Second Suppl. Br., Doc. 43.)

The Court held a hearing on the Motion on December 6, 2019.  (*See*, Doc. 58.)

## II.   CONDITIONAL CERTIFICATION OF THE CLASS

Because the Settlement Agreement affords both monetary and non-monetary relief, Chen asks the Court to conditionally certify the proposed Class for settlement purposes under both Rules 23(b)(2) and 23(b)(3).  (*See* Mem. at 12–19; *cf. Jermyn v. Best Buy Stores, L.P.*, 276 F.R.D. 167, 169 (S.D.N.Y. 2011) (finding that the Supreme Court's decision in *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011), did not undermine the *Jermyn* court's earlier decision to certify a 23(b)(2) "injunction class" and 23(b)(3) "damages class").)  She also asks the Court to conditionally certify the Equal Pay Act ("EPA") collective action under 29 U.S.C. § 216(b).  (Mem. at 19–21.)  The Court addresses the requests in order.

"A party seeking class certification must satisfy the requirements of Federal Rule of Civil Procedure 23(a) and the requirements of at least one of the categories under Rule 23(b)."  *Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 542 (9th Cir. 2013).  Rule 23(a) "requires a party seeking class certification to satisfy four requirements: numerosity, commonality, typicality, and adequacy of representation."  *Id.* (citing *Wal-Mart*, 564 U.S.

1  at 350).  Rule 23(a) provides:

2       One or more members of a class may sue or be sued as representative parties
3       on behalf of all members only if:

4            (1) the class is so numerous that joinder of all members is
             impracticable;
5            (2) there are questions of law or fact common to the class;
             (3) the claims or defenses of the representative parties are typical of
6            the claims or defenses of the class; and
7            (4) the representative parties will fairly and adequately protect the
             interests of the class.

8

9  Fed. R. Civ. P. 23(a).  "If the court divides the class into subclasses . . ., then 'each

10 subclass must independently meet the requirements for the maintenance of a class action.'"

11 *Bates v. United Parcel Serv.*, 204 F.R.D. 440, 443 (N.D. Cal. 2001) (quoting *Officers for*

12 *Justice v. Civil Serv. Comm'n of City & Cty. of S.F.*, 688 F.2d 615, 630 (9th Cir. 1982)).

13      "Rule 23 does not set forth a mere pleading standard.  A party seeking class

14 certification must affirmatively demonstrate his compliance with the Rule—that is, he

15 must be prepared to prove that there are *in fact* sufficiently numerous parties, common

16 questions of law or fact, etc."  *Wal-Mart*, 564 U.S. at 350.  This requires a district court to

17 conduct a "rigorous analysis" that frequently "will entail some overlap with the merits of

18 the plaintiff's underlying claim."  *Id.* at 350–51 (internal quotation marks omitted).

19      Additionally, "the proposed class must satisfy at least one of the three requirements

20 listed in Rule 23(b)."  *Id.* at 345.  The Court may certify a class under Rule 23(b)(2) if "the

21 party opposing the class has acted or refused to act on grounds that apply generally to the

22 class, so that final injunctive relief or corresponding declaratory relief is appropriate

23 respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  Rule 23(b)(3), by contrast,

24 permits certification where "the court finds that the questions of law or fact common to

25 class members predominate over any questions affecting only individual members, and

26 that a class action is superior to other available methods for fairly and efficiently

27 adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

28

7

A.    **The Proposed Class Meets All Rule 23(a) Requirements**

Although the Class comprises a Nationwide Sub-Class and a California Sub-Class, the Court conducts the conditional certification analysis with respect to the Class as a whole, because the subclasses here serve as vehicles by which to separate class members to whom California law applies from those to whom it does not.  (*See* Mem. at 2.) Additionally, Chen does not address the 23(a) requirements separately as to each subclass.

1.    **Numerosity**

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  The parties estimate that the Class totals 1,370 members.  (Mem. at 13.)  The proposed Class thus meets the numerosity requirement.

2.    **Commonality**

Rule 23(a)(2) requires that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2).  "Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury."  *Wal-Mart*, 564 U.S. at 349–50 (internal quotation marks omitted).  The plaintiff must allege that the class members' injuries "depend upon a common contention" that is "capable of classwide resolution."  *Id.* at 350. In other words, the "determination of [the common contention's] truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Id.* "What matters to class certification . . . is not the raising of common questions—even in droves—but rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation."  *Id.* (internal quotation marks omitted).

Here, Chen alleges that Western Digital systemically discriminated against Class Members in pay, promotions, and placements based on gender.  The systemic nature of the allegations lends itself to resolution on a class-wide basis.  Accordingly, Chen has satisfied the commonality requirement.  *See Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492, 531 (N.D. Cal. 2012) (finding commonality and certifying class where the plaintiffs "presented significant proof of companywide policies and companywide gender disparities").

1

        3.      **Typicality**

2       Rule 23(a)(3) requires "the claims or defenses of the representative parties [to be]

3   typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  "[U]nder the

4   rule's permissive standards, representative claims are 'typical' if they are reasonably

5   coextensive with those of absent class members; they need not be substantially identical."

6   *Dukes v. Wal-Mart Stores, Inc.*, 603 F.3d 571, 613 (9th Cir. 2010) (en banc) (quoting

7   *Hanlon v. Chrysler Corp*, 150 F.3d 1011, 1020 (9th Cir. 1998)), *overruled on other*

8   *grounds*, *Wal-Mart*, 564 U.S. 338.  As to the representative, "[t]ypicality requires that the

9   named plaintiffs be members of the class they represent."  *Dukes*, 603 F.3d at 613 (citing

10  *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156 (1982)).  The commonality, typicality,

11  and adequacy-of-representation requirements "tend to merge."  *See Wal-Mart*, 564 U.S. at

12  349 n.5.

13      Here, Chen's claims, like those of the proposed Class, arise from the same policies

14  and practices to which all Class Members were allegedly subjected. (*See* Mem. at 15.)

15  Chen is a member of the Class she represents (the California Sub-Class more specifically):

16  she held a Covered Position at a Western Digital California office during the applicable

17  class period.  (Chen Decl. ISO Mot., Doc. 6-5 ¶ 2.)  Therefore, typicality is met.

18

        4.      **Adequacy**

19      Rule 23(a)(4) permits certification of a class action only if "the representative

20  parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P.

21  23(a)(4).  "Resolution of two questions determines legal adequacy: (1) do the named

22  plaintiffs and their counsel have any conflicts of interest with other class members and

23  (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of

24  the class?"  *Hanlon*, 150 F.3d at 1020.

25      Addressing the questions in reverse order, the Court first notes that Chen has

26  already expended significant time and effort prosecuting this case and protecting the

27  interests of the proposed Class.  (*See* Chen Decl. ISO Mot. ¶¶ 13–14.)  The declaration she

28  has submitted in support of this Motion "provides this Court with sufficient facts to

1  determine that she is an engaged representative, [and] that she has taken her duties as a

2  class representative seriously[.]"  *Jaffe v. Morgan Stanley & Co.*, No. C 06-3903 TEH,

3  2008 WL 346417, at *6 (N.D. Cal. Feb. 7, 2008).

4          Second, the Court is satisfied that Chen's interest is coextensive with that of the

5  Class—both seek to "root[] out systemic gender discrimination at Western Digital and

6  equaliz[e] pay, promotion, and placement opportunities for women at the company."  (*See*

7  Mem. at 16.)  As the Court notes above, however, the Court had concerns with Chen's

8  revelation in a footnote that she had separately reached a confidential settlement of her

9  individual, non-Class claims with Western Digital (*see* Mem. at 26 n.14).  Having

10 requested, received, and reviewed two rounds of supplemental briefing on the issue, and

11 having reviewed Chen's individual settlement agreement (filed under seal with the Court),

12 the Court is satisfied that the agreement does not pose a threat of conflict between Chen

13 and absent class members.  Chen's non-class claims are distinct from those of absent class

14 members, and the Court finds no indication that Chen has benefited at the expense of the

15 Class.  *See Rowe v. E.I. DuPont de Nemours & Co.*, No. CIV. 06-1810 RMB/AMD, 2011

16 WL 3837106, at *5 (D.N.J. Aug. 26, 2011) (finding "no evidence of collusion or threat of

17 conflict" after reviewing class representatives' individual settlement agreements releasing

18 "numerous, individual claims" *in camera*, where, as here, "[t]he agreements d[id] not

19 predicate the release of such claims on the Court's approval of the class settlement or

20 otherwise implicate the class settlement" nor "demonstrate that the class representatives

21 received disproportionate relief when compared to the relief provided to the class"); *Jaffe*,

22 2008 WL 346417, at *5–6 (finding class representative adequate even though she had

23 separately settled her non-class claims for $125,000 where non-class claims were "distinct

24 from the class claims" and "there [wa]s no evidence that [the class representative] did, in

25 fact, fail to evaluate the settlement, sacrifice the interests of absent class members to her

26 own, or accept an unfair settlement").  The Court therefore finds no sign of potential

27 conflicts of interest between Chen and the Class Members she seeks to represent.

28          However, the Court does note that Chen seeks a service award of $50,000, almost

10

1   fourteen times the average value of the payouts that Class Members will receive ($3,615).

2   (*See* Settlement Agreement § 6; Mem. at 23.)  Courts recognize a potential conflict of

3   interest between a named plaintiff and the class "when, as here, there is a large difference

4   between the enhancement award and individual class member recovery."  *Mansfield v. Sw.*

5   *Airlines Co.*, No. 13CV2337 DMS (KSC), 2015 WL 13651284, at *7 (S.D. Cal. Apr. 21,

6   2015).  The existence of a common fund, as here, heightens this concern, because the

7   enhancement award reduces the funds available for payments to class members.  *Cf.*

8   *Campbell v. Best Buy Stores, L.P.*, No. LACV-1207794-JAK (SHX), 2015 WL 12744268,

9   at *4 (C.D. Cal. June 23, 2015) ("Given that the service enhancement awards would reduce

10  the amount of the class settlement funds available for the Net Payments to other Class

11  members, a potential conflict could be present.").  Recognizing these principles, at the

12  final approval stage, the Court will "be vigilant in scrutinizing all incentive awards to

13  determine whether they destroy the adequacy of the class representatives."  *Radcliffe v.*

14  *Experian Info. Sols. Inc.*, 715 F.3d 1157, 1163 (9th Cir. 2013).  Nevertheless, it is the

15  Court—not the parties—that will determine an appropriate incentive award.  Thus, at this

16  preliminary stage—and in the absence of any apparent actual conflict—the Court

17  concludes that Chen is an adequate Class Representative.

18         As to the adequacy of Chen's Counsel, the Court must consider "(i) the work

19  counsel has done in identifying or investigating potential claims in the action;

20  (ii) counsel's experience in handling class actions, other complex litigation, and the types

21  of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv)

22  the resources that counsel will commit to representing the class."  Fed. R. Civ. P.

23  23(g)(1)(A).

24         Chen requests that the Court appoint David Sanford as Lead Class Counsel and

25  Felicia Medina as Class Counsel.  (*See* Mem. at 16–17.)  Sanford is "currently serving as

26  lead counsel in numerous class, individual, and *qui tam* matters."  (Sanford Decl. ISO

27  Mot., Doc. 6-2 ¶ 3.)  In the past, he served as lead counsel in a Southern District of New

28  York case that "resulted in the largest verdict in a Title VII discrimination class action in

United States history." (*Id.* ¶ 4.)  Sanford has also received multiple awards in recognition of his trial work and work in the employment law field.  (*See id.* ¶ 5.)  Medina, too, is "currently serving as lead counsel in numerous class, collective, and individual matters." (Medina Decl. ISO Mot., Doc. 6-4 ¶ 2.)  She has "led some of the country's most significant employment cases" and, since 2008, has secured over fifteen settlements in Title VII and wage-and-hour class action cases.  (*Id.*)  Medina was also counsel on the S.D.N.Y. case mentioned above.  (*Id.* ¶ 3.)  She is or was lead counsel or co-lead counsel in at least six class and collective actions.  (*See id.* ¶ 4.)  Finally, Medina has also been recognized with multiple awards, some specifically recognizing her work in employment law.  (*See id.* ¶ 6.)  Based on this experience and the quality of work of Chen's counsel in this action to date, the Court concludes that both Sanford and Medina satisfy the adequacy requirement and appoints them as Lead Class Counsel and Class Counsel, respectively, in this action.

### B.   The Proposed Class Meets the Rule 23(b)(2) Requirements

Chen seeks certification under Rule 23(b)(2).  (Mem. at 17.)  For the reasons set forth below, the Court finds that certification of the Class under Rule 23(b)(2) is appropriate.

Rule 23(b)(2) permits class treatment where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  "The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them."  *Wal-Mart*, 564 U.S. at 360 (internal quotation marks omitted).  "In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class."  *Id.*

1    Here, all Class Members were allegedly exposed to uniform, discriminatory "pay,

2    promotion, and placement policies and practices" by Western Digital.  (*See* Mem. at 17.)

3    In other words, Western Digital allegedly "acted on grounds that apply generally to the

4    proposed class and subclass, rendering certification under Rule 23(b)(2) appropriate."

5    *Parsons v. Ryan*, 754 F.3d 657, 689 (9th Cir. 2014).  And the programmatic relief the

6    parties fashioned to address those policies and practices "'applies to the proposed class as a

7    whole without requiring differentiation between class members.'"  *Id.* (quoting *DG ex rel.*

8    *Stricklin v. Devaughn*, 594 F.3d 1188, 1201 (10th Cir. 2010)).  The programmatic relief

9    therefore meets Rule 23(b)(2)'s requirement that "final injunctive relief . . . is appropriate

10   respecting the class as a whole."  *See* Fed. R. Civ. P. 23(b)(2).

11

12   **C.      The Proposed Class Also Meets the Rule 23(b)(3) Requirements**

13   Chen also seeks certification under Rule 23(b)(3).  (Mem. at 18.)  For the following

14   reasons, the Court finds that certification of the proposed Class is also appropriate under

15   Rule 23(b)(3).

16   Under Rule 23(b)(3), a class action may be maintained if: "[1] the court finds that

17   the questions of law or fact common to class members *predominate* over any questions

18   affecting only individual members, and [2] that a class action is *superior* to other available

19   methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. R. 23(b)(3)

20   (emphases added).  When examining a class that seeks certification under Rule 23(b)(3),

21   the Court may consider:

22         (A) the class members' interests in individually controlling the prosecution
           or defense of separate actions;
23         (B) the extent and nature of any litigation concerning the controversy already
           begun by or against class members;
24         (C) the desirability or undesirability of concentrating the litigation of the
           claims in the particular forum; and
25

26

27

28

13

1  (D) the likely difficulties in managing a class action.[5]

2  *Id.*  The Court finds that the proposed Class satisfies both the predominance and

3  superiority requirements.

4              **1.    Predominance**

5      "[T]he predominance analysis under Rule 23(b)(3) focuses on the relationship

6  between the common and individual issues in the case, and tests whether the proposed

7  class is sufficiently cohesive to warrant adjudication by representation."  *Abdullah v. U.S.*

8  *Sec. Associates, Inc.*, 731 F.3d 952, 964 (9th Cir. 2013) (internal brackets and quotation

9  marks omitted).  "Rule 23(b)(3) requires [only] a showing that questions common to the

10  class predominate, not that those questions will be answered, on the merits, in favor of the

11  class."  *Id.* (alteration in original).

12      Here, as discussed more generally above, Class Members' claims stem from

13  allegedly discriminatory "*company-wide* policies, practices, and procedures concerning

14  pay levelling, stock and bonus distribution, promotions . . . , and placement practices[.]"

15  (Mem. at 15. (emphasis added).)  These common issues—questions—predominate in this

16  action.  *See In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953, 958–59

17  (9th Cir. 2009) ("[U]niform corporate policies will often bear heavily on questions of

18  predominance and superiority.  . . .  [C]entralized rules, to the extent they reflect the

19  realities of the workplace, suggest a uniformity among employees that is susceptible to

20  common proof.").

21              **2.    Superiority**

22      The Court also finds that a class action would be a superior method of adjudicating

23  Chen's class claims.  "The superiority inquiry under Rule 23(b)(3) requires determination

24  of whether the objectives of the particular class action procedure will be achieved in the

25  _____

26      [5] This factor is not relevant in the context of certification for settlement purposes.  *See*
*Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 620 (1997) ("Confronted with a request for
27  settlement-only class certification, a district court need not inquire whether the case, if tried,
would present intractable management problems, for the proposal is that there be no trial.")
28  (internal citation omitted).

particular case." *Hanlon*, 150 F.3d at 1023.  "This determination necessarily involves a comparative evaluation of alternative mechanisms of dispute resolution." *Id.*  Here, each member of the proposed Class pursuing a claim individually would burden the judicial system and run afoul of Rule 23's focus on efficiency and judicial economy, especially because, as Chen points out (*see* Mem. at 19), discovery would necessarily be duplicative of the extensive discovery and investigation she has already conducted.  *See Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 946 (9th Cir. 2009) ("The overarching focus remains whether trial by class representation would further the goals of efficiency and judicial economy.").  Further, individual litigation costs would likely exceed potential individual recovery, counseling in favor of finding superiority.  *See Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) ("Where recovery on an individual basis would be dwarfed by the cost of litigating on an individual basis, this factor weighs in favor of class certification.").  And the Court agrees that "class members' ability to opt out of the monetary relief class" diminishes their "interest in individually controlling the common portions of this action." *Ellis*, 285 F.R.D. at 539–40.  Finally, the Court has no concerns with concentrating this litigation in this District; indeed, as Chen points out, she resides in and worked for Western Digital in this District (Mem. at 19).

In sum, having considered the non-exclusive factors set forth under Rule 23(b)(3), the Court finds that class treatment here is superior to other methods of adjudication. Therefore, the Court concludes that the proposed Class may be certified under Rule 23(b)(3).

### D.    Rule 23(g) – Appointment of Class Counsel

Under Rule 23(g), "a court that certifies a class must appoint class counsel."  Fed. R. Civ. P. 23(g)(1).  As already discussed, the Court is satisfied that Plaintiff's counsel, David Sanford and Felicia Medina, are adequate and thus may be appointed as Lead Class Counsel and Class Counsel, respectively, in this case.

1   Having found that the proposed Class satisfies the elements of Rule 23(a), 23(b)(2),

2   and 23(b)(3), the Court conditionally certifies the Class for settlement purposes only.

3

4   **III.   CONDITIONAL CERTIFICATION OF THE EPA COLLECTIVE ACTION**

5

6   Chen moves to conditionally certify an EPA collective action pursuant to the Fair

7   Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b).  The collective action comprises "all

8   women below the level of 'Senior Director' who were or are employed by Western Digital

9   . . . in the United States between November 1, 2013 and date of Order Granting

10  Preliminary Approval in an 'indirect labor' position[.]"[6]  (Mem. at 19–20.).

11  The Fair Labor Standards Act permits an employee to bring an action "for and in

12  behalf of himself . . . and other employees similarly situated."  29 U.S.C. § 216(b).  By

13  satisfying the "slightly different, but more stringent requirements for class certification

14  under Rule 23," Chen has also met her burden for certifying an FLSA collective action.

15  *Clesceri v. Beach City Investigations & Protective Servs., Inc.*, No. CV-10-3873-JST RZX,

16  2011 WL 320998, at *4 (C.D. Cal. Jan. 27, 2011); *see also Harris v. Vector Mktg. Corp.*,

17  753 F. Supp. 2d 996, 1003 (N.D. Cal. 2010) ("Courts have generally held that the

18  'similarly situated' standard under the FLSA is not as stringent a standard as the 'common

19  questions predominate' standard under Federal Rule of Civil Procedure 23(b)(3).").

20  To join a collective action, employees must provide consent in writing and "such

21  consent [must be] filed in the court in which such action is brought."  29 U.S.C. § 216(b).

22  While most courts have found that collective and class action claims can be brought in the

23  same proceeding, *see Murillo v. Pac. Gas & Elec. Co.*, 266 F.R.D. 468, 471–73 (E.D. Cal.

24  2010), a Rule 23 class action settlement cannot be used to undermine the FLSA's opt-in

25  requirement.  *See Campbell v. City of Los Angeles*, 903 F.3d 1090, 1105 (9th Cir. 2018)

26

27  _____

28  [6] "[E]xcluding those who became employed by Western Digital Corporation or an affiliated entity as a result of or in connection with an acquisition on or after May 1, 2016."  (Mem. at 20.)

("Rule 23 allows for representative actions in which class members' interests are litigated by the named plaintiff. . . . Proceeding as a class action is thus conditioned on the court's approval and results in a less active role in the litigation for members of the class than if litigating individually. . . . Congress added the FLSA's opt-in requirement with the express purpose of 'bann[ing]' such actions under the FLSA.") (alteration in original). This Settlement Agreement, as drafted, is problematic in that regard.

The Settlement Agreement provides that Collective Action Plaintiffs opt in by cashing their settlement checks. (*See* Settlement Agreement § 11.2.)  In support of this mechanism, Chen claims that "[c]ourts in California have approved this opt-in process in cases under the EPA." (Mem. at 21.)  But she supports this contention with a single, incomplete citation to a case that does not even discuss the court's reasoning for approving this opt-in process.  The Court is not convinced.  On the contrary, the Court is persuaded by the reasoning in *Smothers v. NorthStar Alarm Servs., LLC*, No. 217CV00548KJMKJN, 2019 WL 280294, at *11 (E.D. Cal. Jan. 22, 2019), in which the court examined several cases the plaintiff offered in support of a substantially similar opt-in mechanism, an examination which led the court to reject the check-cashing method.  *See id.* at *10–12. The *Smothers* court found the cases in support of the mechanism "less than satisfying," for they either did not analyze "whether the check-cashing method complied with" the above-quoted requirement of § 216(b); entirely failed to cite to § 216(b) or provide a "reasoned explanation for dispensing" with its requirements; were distinguishable in that "the court [in those cases] required employees to first return an opt-in form before receiving settlement checks with opt-in endorsement language"; or were "ambiguous as to whether FLSA members initially filed written consent with the court." *See id.* at *11 (collecting cases).

Having conducted this examination, the court in *Smothers* elected to "join[] those [courts] that have consulted § 216(b)'s requirements and rejected similar opt-in by settlement check proposals." *Id.* (collecting cases).  This Court similarly concludes that the check-cashing opt-in mechanism, without more, "does not comply with the plain

language of the FLSA," *Johnson v. Quantum Learning Network, Inc.*, No. 15-CV-05013-LHK, 2016 WL 8729941, at *1 (N.D. Cal. Aug. 12, 2016) (citing 29 U.S.C. § 216(b); *Kempen v. Matheson Tri-Gas, Inc.*, No. 15-CV-00660-HSG, 2016 WL 4073336, at *9 (N.D. Cal. Aug. 1, 2016)).  The parties may correct this deficiency in one of two ways.  The first is to direct putative collective action members to send an opt-in form to the Class Administrator and have Chen file the opt-in forms with the Court.  *See Johnson*, 2016 WL 8729941, at *1; *Smothers*, 2019 WL 280294, at *12.  The second is to send those individuals two separate settlement checks:  one dedicated to their share, if any, of the EPA collective allocation (the EPA Settlement Check) and a separate check for any amount due under the other allotments (the Class Action Settlement Check).  *See* Order Granting Mot. for Final Approval at 6, *Ian Freeman v. Zillow, Inc. et al.,* No. 8:14-cv-01843-JLS-DFM (C.D. Cal. Oct. 3, 2017), ECF No. 152.  With the EPA Settlement Checks, collective action members must also receive a Department of Labor ("DOL") Form WH-58, which includes release language.  Besides this DOL form, the EPA Settlement Checks will state: "I have received and read the Class Notice.  By endorsing and cashing this check, I consent to join the EPA collective action, elect to participate in the Settlement, and agree to release my claims covered by the Settlement."  By cashing their EPA Settlement Check, class members shall be deemed to have opted into the EPA collective action.

Both alternatives require amending the Settlement Agreement and Class Notice.  As but one example, the Settlement Agreement currently defines Collective Action Plaintiffs, in relevant part, as women "who do not *opt out* of the monetary relief provisions of the Settlement."  (Settlement Agreement § 1.6 (emphasis added).)  The parties may not define Collective Action Plaintiffs as having to opt out to *avoid* inclusion, especially because that conflicts even with the check-cashing method.

The Court therefore conditionally "certifies" the EPA collective action for settlement purposes only, provided that the parties amend the Settlement Agreement and Class Notice to remedy these deficiencies.  The parties are ORDERED to file an

amendment to the Settlement Agreement and a revised Class Notice **within fourteen (14)**
**days** of this Order.

## IV.    PRELIMINARY APPROVAL OF CLASS SETTLEMENT

To preliminarily approve a proposed class action settlement, Rule 23(e)(2) requires
the Court to determine whether the proposed settlement is fair, reasonable, and adequate.
*See* Fed. R. Civ. P. 23(e)(2).  Review of a proposed settlement typically proceeds in two
stages, with preliminary approval followed by a final fairness hearing.  Federal Judicial
Center, *Manual for Complex Litigation*, § 21.632 (4th ed. 2004).  "The decision to [grant
preliminary approval and] give notice of a proposed settlement to the class is an important
event.  It should be based on a solid record supporting the conclusion that the proposed
settlement will likely earn final approval after notice and an opportunity to object."  Fed.
R. Civ. P. 23 advisory committee's note to 2018 Amendment.

"To determine whether a settlement agreement meets these standards, a district
court must consider a number of factors, including: the strength of plaintiffs' case; the risk,
expense, complexity, and likely duration of further litigation; the risk of maintaining class
action status throughout the trial; the amount offered in settlement; the extent of discovery
completed, and the stage of the proceedings; the experience and views of counsel; the
presence of a governmental participant[7]; and the reaction of the class members to the
proposed settlement."  *Staton v. Boeing Co.*, 327 F.3d 938, 959 (9th Cir. 2003) (internal
quotation marks omitted).  "The relative degree of importance to be attached to any
particular factor will depend upon and be dictated by the nature of the claim(s) advanced,
the type(s) of relief sought, and the unique facts and circumstances presented by each
individual case."  *Officers for Justice*, 688 F.2d at 625.  "It is the settlement taken as a
whole, rather than the individual component parts, that must be examined for overall

---

[7] This factor does not apply in this case.

fairness, and the settlement must stand or fall in its entirety." *Staton*, 327 F.3d at 960 (internal quotation marks and brackets omitted).

In addition to these factors, where "a settlement agreement is negotiated *prior* to formal class certification," the Court must also satisfy itself that "the settlement is not the product of collusion among the negotiating parties." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946–47 (9th Cir. 2011) (internal brackets omitted). Accordingly, the Court must look for explicit collusion and "more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations." *Id.* at 947. Such signs include (1) "when counsel receive a disproportionate distribution of the settlement," (2) "when the parties negotiate a 'clear sailing' arrangement providing for the payment of attorneys' fees separate and apart from class funds," and (3) "when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund." *Id.*

At this preliminary stage, and because class members will receive an opportunity to be heard on the settlement, "a full fairness analysis is unnecessary." *Alberto v. GMRI, Inc.*, 252 F.R.D. 652, 665 (E.D. Cal. 2008). Instead, preliminary approval and notice of the settlement terms to the proposed class are appropriate where "[1] the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, [2] has no obvious deficiencies, [3] does not improperly grant preferential treatment to class representatives or segments of the class, and [4] falls within the range of *possible* approval[.]" *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1079 (N.D. Cal. 2007) (internal quotation marks omitted) (emphasis added); *see also Acosta v. Trans Union*, *LLC*, 243 F.R.D. 377, 386 (C.D. Cal. 2007) ("To determine whether preliminary approval is appropriate, the settlement need only be *potentially* fair, as the Court will make a final determination of its adequacy at the hearing on the Final Approval, after such time as any party has had a chance to object and/or opt out.").

Based on its analysis below of all applicable factors, the Court finds that the Settlement Agreement should be preliminarily approved.

1

2      **A.      Strength of Plaintiff's Case**

3          Western Digital disputes any liability and asserts that it has fully complied with the

4      law.  (Mem. at 24.)  Although Chen is confident that "her claims have merit," she

5      acknowledges that, absent this settlement, the Class "would face significant legal, factual,

6      and procedural obstacles to recovering damages."  (*Id.*)  Somewhat more specifically,

7      Chen cites as an obstacle that the parties have substantial disputes "as to both merits issues

8      and the certifiability of the Classes," stemming in part from "the constant evolution of

9      Rule 23 jurisprudence."  (*Id.*)  For instance, Western Digital maintains that its "expert's

10     promotions analysis found no statistically significant evidence of discrimination in

11     promotions."  (First Suppl Br. at 4.)  Chen also notes that making her case at trial would be

12     especially demanding given the nature of the case—it "would require substantial

13     preparation and ultimately the presentation of dozens of witnesses and multiple experts."

14     (*See* Mem. at 24.)  Finally, Chen mentions that, if the case were to be litigated past this

15     point, Western Digital would likely challenge the assumptions she used to generate her

16     damages models and estimates.  (*See* First Suppl Br. at 3–4.)  Although these potential

17     obstacles to recovery, as presented, are not necessarily unique to Chen's case, the Court

18     still finds that this factor weighs in favor of granting preliminary approval.

19

20     **B.      Risk, Complexity, and Likely Duration of Further Litigation**

21          This action settled before Chen filed her complaint.  Reasonably, therefore, Chen

22     argues that "the early resolution of this matter, itself, presents substantial benefits to the

23     Class Members and promotes judicial economy" (Mem. at 2).  And, as discussed above,

24     although Chen believes that the class claims have merit, she also raises concerns about the

25     challenges and risks associated with seeking class certification and possibly proceeding to

26     trial.  (*Id.* at 24–25.)   Settlement eliminates the risks inherent in certifying a class,

27     prevailing at trial, and withstanding any subsequent appeals; it may provide the last

28     opportunity for class members to obtain relief.  This factor therefore weighs in favor of

granting preliminary approval.  *See Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 526 (C.D. Cal. 2004) ("In most situations, unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results.").

## C.    Risk of Obtaining and Maintaining Class Certification

As the Court notes above, Chen cites remaining "substantial disputes" between the parties as to Chen's ability to obtain class certification.  (*See* Mem. at 24.)  Although she does not specify Western Digital's arguments against certification, she notes that Western Digital "would have contested the propriety of class treatment both in response to a motion for certification and through any trial."  (*See id.*)  In other words, absent this settlement, Western Digital would oppose certification at any potential juncture, a risk that weighs in favor of granting preliminary approval.

## D.    Amount Offered in Settlement

The Court finds that the amount offered in settlement is reasonable.  The proposed Settlement Agreement provides for a non-reversionary Settlement Fund of $7,750,000. (Settlement Agreement § 1.26.)  In anticipation of mediation, Chen retained an expert statistician, Dr. Dwight Steward, to create regression models that would inform her calculations of Western Digital's maximum exposure.  (*See* Steward Decl. ISO Second Suppl Br., Doc. 43-2 ¶¶ 5, 13, 23; Fuschetti Decl. ISO Second Suppl Br., Doc. 43-1 ¶ 2.) Relying on those models, Chen calculates Defendant's maximum potential liability as ranging between $48,680,000 and $72,000,000.[8]  (First Suppl Br. at 3–4; Fuschetti Decl.

---

[8] At the upper end, $72,000,000 includes $30,602,500 for unequal pay and discrimination in pay, promotions, and job placement; $25,181,000 in liquidated damages under the EPA; $8,368,000 in PAGA civil penalties; and $7,650,000 in prejudgment interest.  (Fuschetti Decl. ISO First Suppl Br. ¶ 9.)  At the lower end, $48,680,000 relies on a regression model that controls for job level and performance rating. (*See id.* ¶ 11–12.)  The lower amount comprises $21,280,000 in
(footnote continued)

ISO First Suppl Br., Doc. 38-1 ¶¶ 8–12.)  Chen therefore estimates the settlement amount to be between 10.8 and 15.9 percent of Western Digital's maximum exposure.  (First Suppl Br. at 3.)  Although Chen argues that this is a settlement value courts routinely approve, none of the cases she cites for support are from the employment discrimination context. (*See id.* at 9, 9 n.3.)  And the reasonableness of the amount offered in settlement turns in part on the nature of the case.  Accordingly, at the final approval stage, Chen must provide the Court with support for her position that the settlement value here is reasonable given the nature of her claims.

Still, "a cash settlement amounting to only a fraction of the potential recovery does not per se render the settlement inadequate or unfair."  *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000)) (internal quotation marks omitted).  Here, the Court's preliminary finding of reasonableness as to the amount offered is underscored by the procedural and merits risks discussed above, and by the settlement's inclusion of significant programmatic relief.  To assess reasonableness, "courts may need to forecast the likely range of possible classwide recoveries and the likelihood of success in obtaining such results.  That forecast cannot be done with arithmetic accuracy, but it can provide a benchmark for comparison with the settlement figure."  Fed. R. Civ. P. 23 advisory committee's note to 2018 Amendment.  Here, the expansive, robust programmatic relief the parties negotiated is especially significant, in part because it is the kind of outcome Chen would have been a lot less likely—if not unlikely—to achieve by taking the case to trial.  *See Officers for Justice*, 688 F.2d at 628 ("Without admitting any violations of law, . . . defendants bound themselves to comply with a broad range of both restrictive and affirmative mandates covering every act, practice, policy, or custom addressed in plaintiffs' complaint. . . .  Undoubtedly, the amount of the individual shares will be less than what some class members feel they deserve but, conversely, more than the defendants

---

unequal pay and pay discrimination; $19,150,000 in liquidated damages; $2,925,000 in PAGA penalties; and $5,320,000 in prejudgment interest.  (*Id.* ¶ 12.)

1   feel those individuals are entitled to.  This is precisely the stuff from which negotiated

2   settlements are made.").  Hence, considering also the significant risks of continued

3   litigation and the difficulties of potential recovery, the Court finds that the amount offered

4   in the Settlement Agreement weighs in favor of preliminary approval.

5       The allocation of the Settlement Fund also appears fair, adequate, and reasonable.

6   "The Fund will be allocated based upon a formula that takes into consideration each Class

7   Member's individual rate of pay and length of employment within the applicable Class

8   Period, as well as whether she has previously signed a release of claims."  (Mem. at 7;

9   Settlement Agreement § 4.3.)  This is a reasonable and fair method of allocation, which

10  weighs in favor of preliminary approval.  *See In re Oracle Sec. Litig.*, No. C-90-0931-

11  VRW, 1994 WL 502054, at *1 (N.D. Cal. June 18, 1994) ("A plan of allocation that

12  reimburses class members based on the extent of their injuries is generally reasonable.")

13  (citing *In re Gulf Oil/Cities Serv. Tender Offer Litig.*, 142 F.R.D. 588, 596 (S.D.N.Y.

14  1992)).

15      Finally, the Settlement Agreement also appears fair, adequate, and reasonable in

16  terms of the claims released by Chen and the other Class Members.  Release by Class

17  Members is limited to "all claims asserted in the Complaint under applicable state, local,

18  and federal law that were brought in the Litigation or that are based on the same facts and

19  circumstances as the claims brought in the litigation."  (Settlement Agreement § 11.1.)

20  Class Members also waive the protection afforded by Section 1542 of the California Civil

21  Code, meaning that they release also claims they "do[] not know or suspect to exist in

22  [their] favor at the time of executing the release," Cal. Civ. Code § 1542.  (*See* Settlement

23  Agreement § 11.1.)  But they do so only as to the claims they are already releasing by not

24  opting out.  (*See id.*)  Although this release includes claims not necessarily presented to the

25  Court, the limited scope of the release weighs in favor of preliminary approval.  *See Hesse*

26  *v. Sprint Corp.*, 598 F.3d 581, 590 (9th Cir. 2010) ("A settlement agreement may preclude

27  a party from bringing a related claim in the future even though the claim was not presented

28  and might not have been presentable in the class action, but only where the released claim

24

1   is based on the identical factual predicate as that underlying the claims in the settled class

2   action.") (internal quotation marks omitted).

3

4        **E.        Stage of the Proceedings and Extent of Discovery Completed**

5        This factor requires the Court to evaluate whether "the parties have sufficient

6   information to make an informed decision about settlement."  *Linney v. Cellular Alaska*

7   *P'ship*, 151 F.3d 1234, 1239 (9th Cir. 1998).  Discovery can be both formal and informal.

8   *See id.*; *Clesceri*, 2011 WL 320998, at *9.  Here, "the parties engaged in substantial

9   informal discovery" ahead of mediation.  (Fuschetti Decl. ISO Mot. ¶ 12.)  As part of that

10  discovery, "Western Digital provided class-wide pay and personnel data for a four-year

11  period, along with hundreds of pages of other relevant documents" and "a written

12  explanation of the data systems."  (*Id.*)  Both parties then retained statisticians to analyze

13  the data.  (*See id.* ¶ 13.)

14       Given these facts, the Court concludes that the parties possess enough information

15  to make an informed settlement decision.  *See In re Mego*, 213 F.3d at 459 (finding

16  plaintiffs had "sufficient information to make an informed decision about the [s]ettlement"

17  where formal discovery had not been completed but class counsel had "conducted

18  significant investigation, discovery and research, and presented the court with

19  documentation supporting those services").  Accordingly, this factor weighs in favor of

20  granting preliminary approval.

21

22       **F.        Experience and Views of Counsel**

23       "Parties represented by competent counsel are better positioned than courts to

24  produce a settlement that fairly reflects each party's expected outcome in litigation."  *In re*

25  *Pac. Enterprises Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995).  As a result, representation

26  by competent counsel familiar with the law in the relevant area and with "the strengths and

27  weaknesses of [the parties'] respective positions "suggests the reasonableness of the

28  settlement."  *In re Immune Response Sec. Litig.*, 497 F. Supp. 2d 1166, 1174 (S.D. Cal.

2007).  "On the other hand, recognizing the potential conflict of interest between attorneys and the class they represent, the Court should not blindly follow counsel's recommendations, but give them appropriate weight in light of all factors surrounding the settlement."  *Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 622 (N.D. Cal. 1979).

As discussed above, Class Counsel are experienced and knowledgeable in this area of the law, and both have endorsed the Settlement Agreement.  (*See* Sanford Decl. ¶ 2; Medina Decl. ¶ 1.)  More importantly, at this stage the Court does not detect a conflict of interest between Class Counsel and the Class.  Accordingly, this factor favors preliminary approval.

### G.   Reaction of Class Members to Proposed Settlement

Chen has not provided evidence of Class Members' reactions to the Settlement Agreement.  However, the Court recognizes that the lack of such evidence is not uncommon at the preliminary approval stage.  Before the Final Fairness Hearing, Class Counsel are ORDERED to submit a sufficient number of declarations from Class Members discussing their reactions to the Settlement Agreement.  A small number of objections at the time of the fairness hearing may raise a presumption that the Settlement Agreement is favorable to the Class.  *See In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1043 (N.D. Cal. 2008).

### H.   Signs of Collusion

The Court finds no signs, explicit or subtle, of collusion between the parties.  Of course, before final approval, the court will "scrutinize closely the relationship between attorneys' fees and benefit to the class" and will not "award[] unreasonably high fees simply because they are uncontested."  *In re Bluetooth*, 654 F.3d at 948 (internal quotation marks omitted).  The Court will also ultimately determine whether Chen's requested service award is justified by the circumstances of this case.  The Court notes, on the other hand, that the Settlement Agreement is the result of a mediation held before a private

mediator (*see* Mem. at 5), which is a factor "that supports the argument that [the agreement] is non-collusive." *Lee v. JPMorgan Chase & Co.*, No. SACV 13-511-JLS-JPR, 2015 WL 12711659, at *6 (C.D. Cal. Apr. 28, 2015).

## I.   The Court's Concerns

In addition to the concern the Court raises above about the opt-in procedure for the EPA Collective Action, the Court has a few other concerns about the Settlement Agreement.

First, the Settlement Agreement provides that Chen will seek a service award of $50,000, which would be in addition to her individual settlement amount and any pro rata distribution she receives as a Class Member.  (Settlement Agreement § 6.1.)  As the Ninth Circuit has noted, a "significant disparity between the incentive awards and the payments to the rest of class members" risks creating a conflict of interest.  *See Radcliffe*, 715 F.3d at 1163.  Accordingly, in her request for an incentive payment, Plaintiff must justify why the incentive award is reasonable, especially in comparison to the anticipated recovery of other Class Members.

Second, Class Counsel represent that they will seek the Court's approval for attorneys' fees totaling up to 33 ⅓% of the Settlement Fund, or $2,583,333.  (Settlement Agreement § 5.1.)  The benchmark for fees in the Ninth Circuit is 25% of the common fund.  *See In re Bluetooth*, 654 F.3d at 942.  Before final approval, the court will "scrutinize closely the relationship between attorneys' fees and benefit to the class" and will not "award[] unreasonably high fees simply because they are uncontested."  *Id.* at 948 (internal quotation marks omitted).  In the motion for fees, costs, and service payment, Class Counsel must therefore make a sufficient showing justifying any upward departure from the Ninth Circuit's fees benchmark to be awarded 33 ⅓% of the Settlement Fund.

Third, one of the organizations Chen identifies as a *cy pres* recipient, the Legal Aid Society of Orange County, now operates under a new name, "Community Legal Aid SoCal."   Based on the Court's examination of Community Legal Aid SoCal's website,

employment discrimination is not a focus of the organization.  While that is not necessarily dispositive, "*cy pres* distribution must be guided by (1) the objectives of the underlying statute(s) and (2) the interests of the silent class members."  *Nachshin v. AOL, LLC*, 663 F.3d 1034, 1039 (9th Cir. 2011) (citing *Six (6) Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1307 (9th Cir. 1990)).  Accordingly, the Court directs the parties to either (1) provide additional information about the nature of Community Legal Aid SoCal's work and why it is an appropriate *cy pres* recipient in this case; (2) identify a new organization as a second *cy pres* recipient of unused funds, one closer in mission to the core issues implicated here; or (3) elect to keep only Legal Aid at Work as the *cy pres* recipient.  The parties are ORDERED to do so **within fourteen (14) days** of this Order.  If the parties choose the second or third route, they must within the same timeframe file a revised version of the Settlement Agreement and Class Notice effecting the change they have chosen to make.

Considering all the factors together, the Court preliminarily concludes that the Settlement Agreement is fair, reasonable, and adequate, provided that Chen addresses the Court's concerns.

## V.      APPROVAL OF THE PROPOSED SETTLEMENT ADMINISTRATOR

According to the Settlement Agreement, the parties have agreed to appoint Rust Consulting, Inc. ("Rust") as the Class Administrator.  (Settlement Agreement § 1.4.)  But Chen has submitted no information about Rust for the Court's review.  In fact, the memorandum in support of the instant Motion does not mention Rust once.  For the Court to approve Rust as Class Administrator, Chen must submit Rust's qualifications, as well as

its anticipated procedures for settlement administration and associated costs.[9]  Chen must do this, too, **within fourteen (14) days** of this Order.

## VI.    <u>PRELIMINARY APPROVAL OF CLASS NOTICE FORM AND METHOD</u>

For a class certified under Rule 23(b)(3), "the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). However, actual notice is not required.  *See Silber v. Mabon*, 18 F.3d 1449, 1454 (9th Cir. 1994).

The Settlement Agreement requires Western Digital to provide Rust with a list of all Collective Action Plaintiffs and Class Members along with their contact information within sixty (60) days of the date of this Order.  (Settlement Agreement § 9.2.1.)  Within fifteen (15) days of receiving this information, Rust will send the Class Notice to all Class Members via First Class Mail, using the last known home addresses identified in the class list and verified or updated through address database searches.  (*Id.* §§ 9.2.2–9.2.3.)  Rust will conduct additional address searches for any Class Notice returned by the Post Office using "skip tracing" and re-mail the Notice if updated addresses are found.  (*Id.* § 9.2.5.)  As for Class Notices returned with envelopes marked "Return to Sender," Rust may also call any last-known telephone numbers, if available or ascertainable, and/or request from Western Digital's counsel updated contact information for any Class Members currently employed by Western Digital.  (*Id.* § 9.2.6.)  Class Members will have sixty (60) days from the date of initial mailing to object to or opt out of the Settlement Agreement.  (*Id.* §§ 9.3.1, 9.4.1.)

---

[9] That the Court has previously approved Rust in other cases does not absolve the parties of the obligation to provide this information.

The Supreme Court has found notice by mail to be sufficient if the notice is "reasonably calculated . . . to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950). The Court finds that the proposed procedure for class notice satisfies this standard.

Under Rule 23, the notice must include, in a manner that is understandable to potential class members: "(i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3)." Fed. R. Civ. P. 23(c)(2)(B). Plaintiff provided the Court with a copy of the proposed Notice, which includes this necessary information. The Court, however, requires the following modification to the Class Notice:

1. Individual awards are calculated by factoring in, among other things, whether a Class Member previously signed a "general release." (*See* Settlement Agreement § 4.3.1.) As the Court mentioned at the hearing on the instant Motion, the Class Notice does not explain to Class Members when they would have signed such a release, and why it is impacting their recovery under this settlement. The parties must include language in the Class Notice to remedy this deficiency.

Subject to the changes discussed above and elsewhere in this Order, the Court approves the form and method of the Class Notice. The Court ORDERS the parties to file any revised version of the Class Notice **within fourteen (14) days** of this Order.

Beyond notice to Class Members, the Class Action Fairness Act of 2005 ("CAFA") requires that certain government authorities receive notice of any class action settled in federal court. *See* 28 U.S.C. § 1715(b). The Settlement Agreement provides that the parties were to fulfill this requirement no later than fifteen (15) days after filing the instant

Motion.  (*See* Settlement Agreement § 2.6.)  The parties have not filed proof of having done so and are therefore ORDERED to file such proof **within fourteen (14) days** of this Order.

## VII.  <u>CONCLUSION</u>

For the reasons discussed above, the Court (1) conditionally certifies the Class and the EPA Collective Action for settlement purposes only; (2) preliminarily approves the Settlement Agreement, subject to the changes discussed herein; (3) names Yunghui Chen as Class Representative; (4) names David Sanford and Felicia Medina as Lead Class Counsel and Class Counsel, respectively; and (5) approves the form and method of the Class Notice, subject to the changes discussed above.  The Court reiterates that the parties are ORDERED to **file the following for approval within fourteen (14) days** of this Order:

    1.  A revised Class Notice and amended Settlement Agreement effecting the following changes discussed herein:

        a.  updating the *cy pres* recipients consistent with the Court's directions in Section IV.I., *supra*, provided the parties elect to make either of the Court's two proposed changes to the *cy pres* recipients rather than provide the Court with additional information on Community Legal Aid SoCal;

        b.  amending the collective action opt-in mechanism—and any relevant provisions or sections in the Settlement Agreement and Class Notice—in one of the two ways the Court identifies in Section III, *supra*; and

        c.  adding language to the Class Notice to explain to Class Members when some of them would have signed a "general release" and why that impacts their recovery under this settlement.

31

1             2.  Supplemental information regarding Rust Consulting, Inc.'s

2                qualifications and anticipated procedures with associated costs.

3             3.  Proof of compliance with the CAFA notice requirement.

4       Additionally, **at the final approval stage** (which encompasses the motion for fees,

5  costs, and service payment), the parties must justify their above-benchmark attorneys' fees

6  request and the large service award they seek for Chen.  They must also provide cases

7  supporting the settlement amount as a percentage of Western Digital's maximum exposure

8  by reference to other class action settlements in the employment discrimination context.

9  Finally, they should provide a sufficient number of declarations as to Class Members'

10  reactions to the settlement.

11       The Court sets a Final Fairness Hearing for **November 20, 2020, at 10:30 a.m.**, to

12  determine whether the settlement should be finally approved as fair, reasonable, and

13  adequate to Class Members.[10]  Chen shall file her motion for final approval no later than

14  **October 9, 2020**.  Class Counsel and Chen shall file their motion for fees, costs, and

15  service payment **no later than thirty (30) days before** the exclusion deadline.

16

17  DATED: April 03, 2020

18                                         _____

19                         JOSEPHINE L. STATON

20                         UNITED STATES DISTRICT JUDGE

21

22

23

24

25

26

27

28

---

[10] The Court reserves the right to continue the date of the Final Fairness Hearing without further notice to Class Members.